SHORES, Justice.
This case involves the restructuring of single-member districts for the election of the members of the Alabama State Board of Education. These appeals arise out of a court-approved consent judgment that establishes a redistrieting plan for future elections.
In accordance with § 16-3-1, Ala.Code 1975, the State Board of Education consists of nine members, with eight being elected members and the Governor acting ex officio. After the 1980 federal decennial census, it became evident that population changes had resulted in unconstitutionally unequal district *682 populations for purposes of the State Board of Education election. However, because the legislature failed to take the appropriate corrective action, a federal lawsuit ensued. Ultimately, a federal district judge ordered the establishment of new boundaries to create districts of equal population. Watkins v. State Bd. of Educ., .No. 84r-H-746-N (M.D.Ala., memorandum opinion, Dec. 20, 1985). After the 1990 federal decennial census, it was again evident that population changes had resulted in unequal districts. The legislature did not redraw the district lines before its May 1993 regular session concluded, and this action was filed.
Five black plaintiffs[1] (hereinafter “the Hayden plaintiffs”) filed this action in May 1993 in Montgomery County against Secretary of State Jim Bennett, based on the Voting Rights Act, 42 U.S.C. § 1973; the Fourteenth and Fifteenth Amendments to the United States Constitution; and Article I, §§ 1, 2, and 33, of the Alabama Constitution. The Hayden plaintiffs represent black Alabama electors who claim to be “adversely affected” by the State’s having districts of unequal population; the Hayden plaintiffs allege that the unequal districts result in discrimination and an underrepresentation of black citizens on the State’s school board. Secretary of State Bennett answered the complaint and admitted some of the allegations.
On May 18, 1993, one day after the initiation of the Montgomery County action, Debra Gravois, Vince Amaro, and Bradley Ware filed another State Board of Education redistricting action in Shelby County.[2] Subsequently, Bettye Fine Collins, who was originally a defendant in the Shelby County case as a member of the State Board of Education, realigned herself as a plaintiff. On June 17, 1993, Secretary of State Bennett moved to dismiss the Shelby County action, based on jurisdictional grounds, because of the existing Montgomery County proceedings.
The Montgomery County trial judge, Eugene Reese, set a July 29, 1993, deadline for parties to submit proposed redistrieting plans, and he set a hearing for August 5, 1993, at which submitted plans were to be discussed. The Hayden plaintiffs submitted the only redistrieting plan, and both sides in the Montgomery County action moved for approval of a proposed consent judgment ordering the implementation of that plan.
The proposed plan contains the eight required districts, and under that plan those districts have a population deviation of 9.79%. The overall relative range of population deviation measures the degree, in terms of percentage, that -a plan deviates from absolute population equality in its districts. The primary disputed district in this plan, District Four, extends from the western edge of Jefferson County for 25 miles along an Interstate Highway 59 corridor to include parts of the City of Tuscaloosa and most of Tuscaloosa County’s population.[3]
On August 5, 1993, Judge Reese approved the proposed consent judgment after a hearing without testimony, subject to the approval of the United States Attorney General.[4] According to the consent judgment, the districts set up by the plan will be used in all future elections until the state legislature passes a redistrieting plan precleared by the United States Justice Department or until the next federal decennial census indicates population variations that make redistrieting again necessary. The trial court made several findings as a basis for its approving the consent judgment, including: a finding that the pre-existing districting plan (based on the pre-1990 census) violated the state and federal constitutions; a finding that the proposed plan fully complies with the state and federal constitutions; a finding that the proposed plan had received the most legislative *683 support, especially minority support, including approval in the State House of Representatives; and a finding that the proposed plan had been approved by the State’s school board, including its two minority members.
On August 13, 1993, proceedings in the Shelby County redistricting case were stayed pending resolution of the Montgomery County action. On August 27, 1993, Gravois, Amaro, Ware, and Collins sought to intervene in the Montgomery County lawsuit. They were allowed to intervene, and on September 20,1993, they filed a motion for relief from the consent judgment. Their motion requested that the consent judgment be changed to achieve population equality and that District Four be restructured to eliminate its irregular shape, which according to the intervenors, made the district presumptively unconstitutional. The Shelby County action was later dismissed because of the intervention in the Montgomery County ease.
On December 13, 1993, the Montgomery Circuit Court conducted a hearing on the intervenors’ motion for relief. Dr. Joe Reed testified in favor of the consent judgment, while Dr. William Stewart, chair of the University of Alabama’s Political Science Department, testified for the intervenors.
At the hearing, the intervenors proposed an alternative plan, known as the Domnano-vich Plan, which contains the eight required districts and which has a population deviation of 0.00%. This plan eliminates the consent judgment plan’s District Four; it creates different districts, including a new District Four with a “finger-like” extension into Jefferson County. According to the intervenors, this plan breaks only 6 counties, while the consent judgment plan breaks 11 counties. The intervenors also contend that their plan would create two “majority black voting” school board districts, while the consent judgment plan would have only one such district.
On December 16, 1993, the intervenors filed a motion for “reconsideration” of the dismissal of the Shelby County action. On January 7, 1994, the Montgomery Circuit Court denied the intervenors’ motion for relief. Subsequently, all of the intervenors, except Ware, appealed. On February 2, 1994, the Shelby County circuit judge held a hearing on the motion for “reconsideration” of the Shelby County dismissal, and then set aside that Shelby County dismissal, pending this appeal.[5]
The first primary issue in this case is whether the consent judgment relating to the State Board of Education election districts violates the equal protection doctrine by adopting a plan with a 9.79% overall relative range of population deviation between districts, as opposed to the intervenors’ proposed plan, which has a 0.00% population deviation. The second primary issue is whether the “scorpion-like” shaped District Four of the plan adopted by the consent judgment is the result of racial gerrymandering.
According to the Hayden plaintiffs and Secretary of State Bennett, the court-approved plan does comply with the constitutionally acceptable 10% de minimis deviation standard for noncongressional legislative redistricting plans, as discussed in Mahan v. Howell, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 modified, 411 U.S. 922, 93 S.Ct. 1475, 36 L.Ed.2d 316 (1973), and Brown v. Thomson, 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983), and, thus, requires no justification. In addition to arguing that District Four’s configuration is not “bizarre” in shape, they argue that District Four was extended into Tuscaloosa for various reasons aside from race, including: compliance with the constitutional one-person, one-vote requirement,[6] protection of incumbents, political acceptance by the Alabama Legislature *684 and the Alabama State Board of Education, preclearance by the United States Justice Department, preservation of communities of interest, and retrogression.
The intervenors contend that the Hayden plaintiffs and Secretary of State Bennett failed to justify their policy reasons for a 9.79% population deviation and, therefore, that the intervenors’ proposed plan, which obtains population equality, should have been adopted instead. The intervenors state that with court-ordered legislative redistricting plans, the 10% de minimis rule is not the standard. Also, they argue that District Four in the consent judgment plan is unconstitutionally irregular and dramatically shaped, according to Shaw v. Reno, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), and, therefore, is a racial classification that is not narrowly tailored to further a compelling interest.
In a recent United States Supreme Court case, Miller v. Johnson, — U.S. —, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995), five white residents in Georgia’s Eleventh Congressional District sued various state officials, challenging the state’s congressional districting plan on the basis that it constituted racial gerrymandering. — U.S. at —, 115 S.Ct. at 2485. The 1990 federal decennial census indicated that Georgia’s population entitled that State to an 11th congressional seat, so the State’s General Assembly set out to redraw the state’s previous 10 districts. Id., — U.S. at —, 115 S.Ct. at 2483. However, the United States Justice Department subsequently refused to preclear two of the General Assembly’s proposed plans because they contained only two majority-black districts, while alternative plans contained three such districts. — U.S. at —, 115 S.Ct. at 2484. Finally, the General Assembly created three majority-black districts in order to gain the Justice Department’s preclearance under the Voting Rights Act. Id.
As a result, the Eleventh District covered 6,784.2 square miles, included parts of Atlanta, Augusta, and Savannah, split an excessive number of counties and municipalities, and was linked at some points merely by land bridges, thus connecting black neighborhoods whose social, political, and economic interests were disparate. Id. A three-judge panel from the United States District Court for the Southern District of Georgia declared the Eleventh District to be invalid, based on Shaw v. Reno, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). Georgia’s redistricting plan failed to withstand strict scrutiny, the court held, because “race was the overriding and predominant force in the district-ing determination.” See Johnson v. Miller, 864 F.Supp. 1354, 1372 (U.S.Dist.Ct.S.D.Ga. 1994). The United States Supreme Court agreed that the redistricting plan violated the Equal Protection Clause. Miller, — U.S. at —, 115 S.Ct. at 2491.
First, we note that, according to the Supreme Court, proof that a district has a bizarre shape, while it may be relevant, is not a prerequisite to proving a denial of equal protection. Id., — U.S. at —, 115 S.Ct. at 2486. As stated in Miller:
“[Shape] may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature’s dominant and controlling rationale in drawing its district lines.... [PJarties may rely on evidence other than bizarreness to establish race-based dis-tricting.”
— U.S. at-, 115 S.Ct. at 2486 (citations omitted).
Second, we note that in Shaw v. Reno, 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), the United States Supreme Court held that a state’s redistricting plan is unconstitutional if its only explanation is race. 509 U.S. at —, 113 S.Ct. at 2825. In Miller, the Court placed on a plaintiff challenging a districting plan the burden of proving that race was the predominant, but not necessarily the sole, factor in a state’s redistricting plan, while other traditional factors, such as (but not to exclude others) compactness, contiguity, and communities of interest, were subordinated; however, a dis-tricting plan will withstand a gerrymandering claim if the party challenging cannot prove that race-neutral considerations were subordinate to race. Id., — U.S. at —, 115 S.Ct. at 2488. On the other hand, if the challenger proves that race was the predomi *685 nant factor, then a districting plan can survive strict scrutiny only if it is demonstrated that the plan was “narrowly tailored to achieve a compelling interest.” Miller, — U.S. at -, 115 S.Ct. at 2490 (citations omitted).[7]
In light of Miller, we remand this case for further factual findings and inferences in order for the trial court to determine if race predominated over all other factors considered in drawing District Four of the consent judgment plan for the state’s school board, and, if it did, whether the plan withstands strict scrutiny.
REMANDED.
HORNSBY, C. J., and MADDOX, ALMON, HOUSTON, KENNEDY, INGRAM, and BUTTS, JJ., concur.

. Andrew Hayden, Rubin McKinnon, Bernest Brooks, Quinton Ross, and Darryl Sinkfield.

. Gravois, et al. v. Snowden, et al., CV-93-385MJ (Shelby County Circuit Court).

. According to the appellants, who characterize its shape as "scorpion-like,” District Four takes in approximately 71% of the black population of Tuscaloosa County.

.On October 18, 1993, the United States Justice Department "precleared” the consent judgment plan.

. On February 14, 1994, counsel representing the intervenors in the Montgomery County case, Albert Jordan and Ferris Stephens, filed an action in a federal court, Sahag, et al. v. Mitchell, et al, CV No. 94-AR-0317-M (N.D.Ala.), challenging the court-approved consent judgment entered in the Montgomery Counly redistricting case. After a March 18, 1994, hearing on the petition for a preliminary injunction, District Judge William Acker denied the request by declining jurisdiction and dismissed the action without prejudice. The subsequent motion to reconsider was also later denied.

. Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

. According to the Miller Court, while a state may have a compelling interest in eliminating past discriminatory effects, it may not have a compelling interest in complying with the Justice Department’s preclearance requirements. Miller, -U.S. at-•, 115 S.Ct. at 2491, Georgia had exceeded the Voting Rights Act's substantive requirements by complying with the Justice Department's maximization policy and therefore had no compelling interest in creating three black-majority districts instead of two, as called for by the census. -U.S. at-, 115 S.Ct. at 2491.