WILKINSON, Chief Judge,
concurring:
I agree that the judgment of the district court should be affirmed, and I concur in Judge Luttig’s fine opinion. I write separately, however, to express my concern about the way in which my dissenting colleague interprets Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). That ease commands us, when analyzing claims of minority vote dilution, to determine whether “the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority’s preferred candidate.” Id. at 51, 106 S.Ct. at 2766-67.
The dissent’s intensely race-conscious approach to that inquiry seems to me at odds with three recent Supreme Court cases whieh have held race-based redistrieting schemes to be in violation of the Constitution. See Bush v. Vera, — U.S.-, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996); Shaw v. Hunt, — U.S. -, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996); Miller v. Johnson, — U.S.-, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). Gin-gles may require us to engage in an inquiry which focuses on racial considerations, but it cannot be read to require us to adopt rules that unconstitutionally tie American polities to racial identity. If my dissenting brother’s view of Gingles prevails, we will be well on our way to the creation of racially separate electorates and a racially separate society. Nothing in Supreme Court precedent compels us to take America in that direction.
By reversing the district court, the dissent would lead us not only to a relentlessly race-conscious trial, but also toward the restructuring of Alamance County electoral districts along racial lines. This is just what the Supreme Court does not allow. Bush, Shaw, and Miller did not overrule Gingles, but they surely set limits on the ability of federal courts to cast voters as members of racial blocs rather than as individuals. In order to identify the “minority-preferred” candidate, we have been forced to wade into a bog of slippery assumptions and statistics. In this case alone, we have been asked to assault such .impenetrable questions as: May a candidate who receives more than 50% of the minority vote, but who finishes behind a successful minority-preferred candidate, also be considered preferred by the minority? If the candidate who is most preferred by the minority is unsuccessful, may other successful candidates who received substantial minority support be considered as preferred by the minority? Should votes for candidates cast by minority voters in general elections be *619 held not to express their true preferences when a candidate favored by minority voters in the primary election failed to win a place on the ballot for the general election? And, should votes for a minority-preferred candidate who is also an incumbent be disregarded when analyzing the successes of minority-preferred candidates?
Where will this road of race-consciousness end? As the above questions demonstrate, the Gingles inquiry is complicated enough in a biracial community. Is the inquiry to become ever more refined and ever more complex as America becomes more multicultural? How do we identify minority-preferred candidates under Gingles when multiple minorities are present? How shall we determine whether a candidate supported to a greater or lesser extent by different minorities is the preferred candidate of a single minority? To what extent are the electoral interests of different racial minorities to be aggregated or kept separate? How broadly or narrowly are the categories of racial minorities to be defined? At some point, this race-based calculus will demonstrate only how far the law has set us on the path to disunion.
Entering this maze of racially laden inquiries reflects a view of American political life as a competition between highly segregated racial forces. Indeed, this is precisely the mistake of the dissent. The dissent’s interpretation of Gingles will not allow courts to accept the votes of minority individuals as expressing their personal preferences. Instead, the dissent mandates that we pass the votes of minority individuals under a microscope in order to determine the racial preferences expressed by those voters.
Under the dissent’s view, all electoral behavior is reducible to race. Thus, the dissent suggests that because voters prefer candidates of their own race, elections in which no minority was a candidate need not be counted. The dissent further suggests that minority votes for a candidate in a general election do not express a preference by the minority unless that candidate was also preferred by the minority in the primary election; that a successful candidate who received more than 50% of the minority vote, but finished behind a successful candidate who received a higher degree of minority support, should not automatically be considered to be preferred by the minority; and that certain electoral successes of incumbent, minority-preferred candidates should not count towards the success of minority individuals in electing their preferred candidate.
And these are but a few of the racially-driven factors that the dissent would fasten upon the judicial review of American elections. In its recent cases, the Supreme Court has made it clear that there is no room in the Constitution for congressional redistricting schemes predicated predominantly on the basis of race. See Bush v. Vera, — U.S. -, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996); Shaw v. Hunt, — U.S. -, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996); Miller v. Johnson, — U.S. -, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). The dissent’s interpretation of Gingles flies in the face of this command by proposing a set of intricate inquiries designed to reinforce the view of American politics as a contest between separate racial voting blocs. The tendency of such rules to “disrupt[] nonracial bases of political identity,” Bush, — U.S. at -, 116 S.Ct. at 1962 (plurality opinion), will be no less than that of drawing district boundaries based on race, and they should be rio more acceptable under the Constitution. “It takes a shortsighted and unauthorized view of the Voting Rights Act to invoke that statute, which has played a decisive role in redressing some of our worst forms of discrimination, to demand the very racial stereotyping the Fourteenth Amendment forbids.” Miller, — U.S. at -, 115 S.Ct. at 2494. In leading us ineluctably to electoral remedies based on racial shares, the dissent “canjjes] us further from the goal of a political system in which race no longer matters — a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire.” Shaw v. Reno, 509 U.S. 630, 657, 113 S.Ct. 2816, 2832, 125 L.Ed.2d 511 (1993).*
*620 It will be said that racial bloc voting is already ensconced in American political life and that courts must learn to embody in law what is established in fact. A Constitution^ however, has its aspirational as well as descriptive aspect. It is informed by the way things ought to be. Were the Fourteenth Amendment no more than a concession to the racial realities of the day, Brown v. Board of Commissioners would have remained an un-taken step. Separation of the races is no better for America now than it was in 1954. It is a sad turn that has led the courts to rebuild the walls they once brought down.

 My good colleague suggests in dissent that the concurring opinion fails to follow the law — “even when it is a law that we might think unwise or unnecessary in today's world.” Of course, the *620 district court followed the law when it found that the Alamance County system conformed fully to section 2 of the Voting Rights Act and did not operate to deny black citizens an equal opportunity to elect candidates of their choice. In voting to reverse the district court, it is the dissent, I ■ respectfully suggest, that has failed to follow the law, because it has mandated a collection of intensely race-conscious inquiries destined to result by way of remedy in the proportional allocation of electoral districts based on race. To pursue this course in the wake of the Supreme Court's repeated cautions against race-conscious districting is simply not supportable.