Donald MOON, et al., Plaintiffs,

v.

M. Bruce MEADOWS, Defendant,

and

Curtis W. Harris, et al., Defendants–
Intervenors.

Civil Action No. 3:95CV942.

United States District Court,
E.D. Virginia,
Richmond Division.

Feb. 7, 1997.

Paul Loy Hurd, Monroe, LA, Bill Helfand, Hirsch, Robinson, Sheiness & Glover, Houston, TX, Douglas Markham, Houston, TX, Stephen A. Katsurinis, Hirsch, Robinson, Sheiness & Glover, Richmond, VA, for Plaintiffs.

Rita Marie Sampson, Francis Snead Ferguson, Gregory E. Lucyk, James Walter Hopper, Office of Attorney General of Virginia, Richmond, VA, Mary Elizabeth Shea, Office of the Attorney General, Criminal Law Division, Richmond, VA, James Stuart Gilmore, III, Attorney General of Virginia, Richmond, VA, David E. Anderson, Frank S. Ferguson, Office of the Attorney General, Richmond, VA, for Defendant.

Stephen Barkai Pershing, ACLU Foundation of Virginia, Richmond, VA, Elaine Ruth Jones, NAACP Legal Defense & Educational Fund, Inc., New York City, Neil Bradley, Maha S. Zaki, M. Laughlin McDonald, American Civil Liberties Union, Atlanta, GA, Mary E. Wyckoff, American Civil Liberties Union, New York City, Theodore M. Shaw, Norman J. Chachkin, Penda Hair, NAACP Legal Defense & Educational Fund, Inc., New York City, Pamela S. Karlan, Charlottesville, VA, J. Gerald Hebert, J. Gerald Hebert, P.C., Alexandria, VA, Cassandra Q. Butts, NAACP Legal Defense & Educational Fund, Washington, DC, for Intervenors-Defendants.

Before WIDENER, Circuit Judge, MERHIGE, Senior District Judge, and ELLIS, District Judge.

## MEMORANDUM

MERHIGE, Senior District Judge:

The primary issue before this Court is the constitutionality of Virginia's allegedly racially-gerrymandered Third Congressional District. This action arises under Articles I, II and IV, § 2, of the United States Constitution; the First, Fifth, Fourteenth and Fifteenth Amendments; 42 U.S.C. § 1973, et seq., and 42 U.S.C. §§ 1981 and 1983. Since all Defendants, including intervenors, reside and vote in the Commonwealth of Virginia, and Plaintiffs suffered their alleged injuries in the Eastern District of Virginia, venue is appropriate under 28 U.S.C. § 1391(b). The Court has jurisdiction pursuant to 28 U.S.C.

§§ 1331, 1343(a)(3) and (4). Because Plaintiffs challenged the constitutionality of the apportionment of Virginia's Third Congressional District, pursuant to 28 U.S.C. § 2284 a district court panel of three judges presided over the case, and its disposition is now ripe.

The sole remaining original Defendant is M. Bruce Meadows, Secretary of the State Board of Elections and a member of that Board. The Board of Elections is responsible for coordinating the conduct of elections in the Commonwealth and issuing certificates of elections. Mr. Meadows is sued on behalf of the Board and in his official capacity.

The results of the 1990 decennial census entitled Virginia to an additional seat in the House of Representatives which is the subject of the present controversy. Plaintiffs seek a declaratory judgment that Va.Code § 24.2–302, which sets out the geographical boundaries of each of Virginia's congressional districts, is unconstitutional. They further seek a judgment that 42 U.S.C. § 1973 is of no further force and effect insofar as it requires the Commonwealth of Virginia to seek preclearance of its statewide redistricting plans. Plaintiffs' challenge to Va.Code § 24.2–302 must, except for that portion of the statute dealing with the Third Congressional District, fail for lack of standing.

The Court, having considered all of the evidence introduced by each of the parties, including intervenors, all exhibits entered in the record, stipulations, argument, and proposed Findings of Fact and Conclusions of Law concludes as follows:

■ That portion of the Complaint in which Plaintiffs pray that the Court declare 42 U.S.C. § 1973 to be of no further force and effect, insofar as it requires the Commonwealth of Virginia to seek preclearance consistent with constitutional requirements, is unsupported by any evidence as to jurisdiction or the merits. This claim will be dismissed for failure to prosecute.

■ Each of the Plaintiffs votes and resides in the Third Congressional District and therefore has standing only to challenge that District as violating the Equal Protection Clause of the Fourteenth Amendment to the Constitution. The Plaintiffs claim that they have been subjected to "the deliberate segregation of voters into [a] separate and bizarre-looking district[s] on the basis of race in violation of the Equal Protection Clause of the Fourteenth Amendment." *See Shaw v. Hunt,* —— U.S. ——, 116 S.Ct. 1894, 135 L.Ed.2d 207 (1996); *Bush v. Vera,* —— U.S. ——, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996); *Miller v. Johnson,* —— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995); *United States v. Hays,* —— U.S. ——, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995).

**BACKGROUND:**

Between the years 1980 and 1990, Virginia's population grew from 5,346,818 to 6,187,35—approximately 15.7%. The black population during the decade grew by about 154,326, so that they now constitute 18.9% of the state's population. Because this population increase entitled Virginia to an additional seat in the United States House of Representatives the General Assembly began redistricting the state to create an eleventh Congressional district. The Chairman of the Joint Privileges and Elections Committee of the Virginia Senate and House of Delegates invited the National Association for the Advancement of Colored People ("NAACP"), the American Civil Liberties Union ("ACLU"), and Virginia's Congressional delegation to use the General Assembly's computer-assisted redistricting system for preparing suggested Congressional district plans and to submit them for the Committee's consideration.

The Virginia NAACP and the ACLU presented similar proposals for a majority black Congressional district which would combine black populations concentrated in urban areas (Henrico County and the Cities of Richmond, Petersburg, Norfolk, Newport News, Hampton, Portsmouth, and Chesapeake) linked by more rural areas along the James River. The ACLU's proposed district contained 66.2% total black population and 63.1% black Voting Age Population ("VAP"). The NAACP's proposed district had 65.4% total black population and 62.1% black VAP.

The Democratic Party Chairman of the 8th Congressional District and Chairman of the

American Party each offered statewide proposals. Analysis by the Virginia Division of Legislative Services staff revealed that the latter two proposals each advocated one black majority district with approximately a 54% total black population.

Then State Senator Robert Scott, a Democrat and a member of the Black Caucus, along with Delegate Kenneth Melvin, (also a Democrat and a member of the Black Caucus, as well as a member of the Virginia House Privileges and Elections Committee) ·each suggested a 55% black majority district and a 45% black influence district as an alternative to one 65% majority district.

Between October 11 and November 20, 1991, the General Assembly conducted hearings and considered additional working draft plans. Of the ten plans receiving consideration, no less than seven proposed that more than 65% of the total population of District 3 be composed of blacks. No plan suggested a District population with a black percentage of less than 60.35%.

On November 20, 1991, the General Assembly of Virginia passed the first version of the statute in issue, providing for a 61.48% black majority of the total population of the new Third Congressional District and a 58.5% black VAP. Following the legislative action, the Act was forwarded to the Governor for his consideration. The Governor, as his right, proposed several revisions including an increase in the black population from 61.48% to 63.98% and an increase in the black percentage of VAP from 58.50% to 61.17%. Additionally, the Governor suggested a shift of predominately black Norfolk precincts from District Two to District Three with a total population of 28,525, 72.5% of whom were black. The Governor also suggested shifting predominately white Norfolk precincts from District Three to District Two. The population affected by this shift was 38,539, 25.93% of whom were black.

The General Assembly adopted the Governor's ·changes, enacted the plan in Va.Code § 24.2–203 and submitted it to the United States ·Department of Justice. By letter dated February 18, 1992, the Department of Justice precleared the plan as submitted.

The General Assembly twice enacted technical modifications to the approved bill complying each time with General Assembly Guidelines. These Guidelines required that any proposed changes *not* substantively change the boundaries of the district and that "no change will reduce the black percentage of total or voting age population in the majority black district (District 3)".[1] The Governor approved the plan and the newly established Third Congressional District elected Senator Scott as its first Congressman.

The District has been aptly described as follows:

The Third Congressional District, as presently configured, is an amalgamation principally of African–American citizens contained within the legislatively determined boundaries for the obvious purpose of establishing a safe black district. The district is anchored in the tidewater cities of Norfolk, Suffolk, and Portsmouth. It crosses the Chesapeake Bay to include portions of the cities of Hampton and Newport News where the African–American population is the majority, using only the open water of the Chesapeake Bay and the James River to connect the disparate and non-contiguous portions of these two small cities. The District then crosses the James River into the largely rural Surry County, recrossing the James River to take in all of the African–American majority Charles City County. In Charles City County the district splits in three directions. To the south the District runs through Prince George County and slices through the City of Hopewell, including only those areas where blacks predominate, before terminating some 30 miles away in the City of Petersburg, which it also divides racially. To the east, the District takes in part of rural southeastern Henrico County before reaching the more built'up and heavily black eastern suburbs of Richmond, racially dividing the capital city nearly in half · before terminating in a small black neighborhood in northern Henrico County. To the north, the

---

1. Guidelines For a Bill to Make Technical Adjustments to the December 1991 Congressional Redistricting Bill which accompanied a January 9, 1992 letter to City/County Election officials.

district widens out to take all of the rural and agricultural counties of New Kent, King William, King and Queen, and ends its roughly 225 mile trek in Essex County along the banks of the Rappahannock River. (Pl.'s Complaint).

## DISCUSSION

■ In order to successfully challenge the Third District, Plaintiffs must first prove that the General Assembly's predominant reason for drawing its boundaries was race. The Supreme Court enunciated the breadth of a plaintiff's burden in a challenge to a racial gerrymander by stating that:

> The plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district. To make this showing a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles including, but not limited to compactness, contiguity, respect for political subdivisions or communities defined by actual shared interests, to racial considerations.

*Miller,* —— U.S. at ——, 115 S.Ct. at 2486.

■ Once a plaintiff proves that race predominates, the State must then justify its use of race under the strict scrutiny standard. Courts apply this rigorous standard because "the purpose of strict scrutiny is to 'smoke out' illegitimate uses of race by assuring that [the State] is pursuing a goal important enough to warrant use of a highly suspect tool." *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 493, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989). To satisfy strict scrutiny in this context, "the State must demonstrate that its redistricting legislation is narrowly tailored to achieve a compelling governmental interest." *Miller,* —— U.S. at ——, 115 S.Ct. at 2490; *Vera v. Richards,* 861 F.Supp. 1304, 1336 (S.D.Tex.1994), *aff'd sub nom Bush v. Vera,* —— U.S. ——, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) ("State's burden is to produce evidence that any districts found to be racially gerrymandered

were dictated by a compelling state interest and are narrowly tailored.").

■ In evaluating the proffered compelling state interest, the Court must determine whether the articulated justification was identified at the time of the plan's enactment, and be satisfied that the Legislature was seeking to remedy a real violation of law. *Shaw,* —— U.S. at ——, 116 S.Ct. at 1902; *Wygant v. Jackson Bd. of Ed.,* 476 U.S. 267, 279, 106 S.Ct. 1842, 1849–50, 90 L.Ed.2d 260 (1986) (state must have convincing evidence that remedial action is necessary before implementing affirmative action.) Once the state establishes a compelling state interest, the Court must determine whether the district was narrowly tailored to achieve that compelling interest. *Wygant,* 476 U.S. at 279, 106 S.Ct. at 1849–50.

### A. *Does Race Predominate?*

■ The evidence, in our view, is overwhelming that the creation of a safe black district predominated in the drawing of the boundaries of the Third Congressional District. Racial consideration was second only to the legally required population standard. Indeed, the Commonwealth admits as much. In seeking approval of the Department of Justice, the then Attorney General of Virginia attached to the Commonwealth's Section 5 preclearance submission a narrative statement that

> [T]he addition of an eleventh congressional district caused the ideal population for a congressional district to remain relatively constant and minimized the potential changes in the area of low growth. Extensive redrawing of district lines was necessitated in the remainder of the Commonwealth, however, to meet ideal population standards, establish a majority Black district, and create a new open district in the Northern Virginia area of highest population growth.

Strikingly, the Attorney General omitted any reference that the traditional race-neutral criteria such as compactness, contiguity, adherence to political subdivision boundaries, or the preservation of interest were considered in the redistricting process.

Evidence of legislative intent, the bizarre shape of the district, and the subordination of traditional districting principles demonstrate that the Commonwealth intentionally drew the Third District's boundary lines to include black populations for the purpose of ensuring "that Black voters in the Commonwealth will be able to elect candidates of their choice." [2]

*Legislative Intent*

The General Assembly's initial plan,[3] created a congressional district that was 61.48% African–American in total population and 58.50% African–American in voting age population. Throughout the redistricting process, the Legislature sought to protect and indeed enhance this initial ratio. The General Assembly's guidelines specifically prohibited any "change[s] [which] will reduce the black percentage of total or voting age population in the majority black district (District 3)." Guidelines for a Bill to Make Technical Adjustments to the December 1991 Congressional Redistricting Bill § B.

The "Summary District Analysis" document details the changes proposed by the Governor to the General Assembly.[4] Of particular importance as to whether race predominated in the creation of the final plan is the section of the Summary Analysis subtitled *"C. Increase the Black Population Percentage in District 3."* This document outlines how the Governor proposed to increase the African–American percentage in District 3 by making adjustments in Districts 1, 2, 3, and 4. For example, the Fort Eustis area in Newport News was moved to District 3 from District 4. In turn, District 4 picked up a part of Virginia Beach to offset the shift of Fort Eustis to District 3. Then, a majority white populated area of Norfolk was moved from District 3 to District 2 in exchange for African–American areas in Norfolk, which were shifted to District 3 from District 2. The document reports that the areas of Norfolk moved to District 3 are 72.50% African–American, while the parts of Norfolk shifted to District 2 are 25.93% African–American. These population shifts increased the Afri-

can–American percentage of the total population to 63.98% and the African–American percentage of the voting age population to 61.17% in District 3. The Governor's proposed changes were adopted and became Chapter 6 of the 1991 Virginia Acts.

Further evidence that race played the predominant role in the development of the new Congressional district as well as the adjoining districts comes from the 1992 and 1993 amendments to the plan. Notably, all of the changes affected only Districts 1 and 3. Although a primary reason for adjusting the districting plan's boundaries before the 1992 and 1994 elections was to reduce the number of split precincts in the plan, the technical amendments resulted in an increase in the Black percentage of the total population to 64.08% and the Black percentage of the voting age population to 61.24% in District 3.

The 1993 amendments moved all of Richmond County, whose population was roughly 69.8% white and 30.2% Black from District 3 to District 1. Still another change effected at that time was the movement of the entire population of James City County which was approximately 80% white and 20% black from District 3 to District 1.

In the preclearance submission, the General Assembly explained that moving Richmond County and James City County to District 1 was offset by shifting parts of the cities of Newport News and Hampton to District 3. The preclearance documents, however, report that the shift of lines in Newport News used race for making the changes by moving a portion of Black population in a particular precinct of the City into District 3 from District 1. These moves were, in the Court's view, a deliberate and integral part of Virginia's predominant attention to the principal goal of creating a safe black district. In the Third Congressional District, these amendments increased the Black percentage of the total population to 64.37% and the Black percentage of the voting age population to 61.6%.

**2.** Attachment 4 dealing with Statement of Anticipated Minority Impact.

**3.** This plan is labeled the Conferees Report of November 20, 1991 (CO705552) in the preclear-

ance submissions documents to the Department of Justice.

**4.** Congressional District Plan, Governor's Amendments plan C0723750. *See* Jt.Ex. 25A.

*Bizarre Shape*

Not only does the direct evidence support the Court's conclusion, the shape and racial characteristics of the district prove that race predominated in drawing its boundaries. The Supreme Court in *Shaw* noted that the appearance of a district was important in evaluating racial gerrymanders. *Shaw v. Reno,* 509 U.S. 630, 647, 113 S.Ct. 2816, 2827, 125 L.Ed.2d 511 (1993) ("[W]e believe that reapportionment is one area where appearances do matter."). State newspapers, admitted into evidence, have described the district as a "grasping claw" or a "squashed salamander." There is little doubt that to establish a safe black district, the Virginia Legislature drew a district with bizarre geographical boundaries. The congressional plan in effect throughout Virginia from 1981 to 1991 split three counties and two cities between congressional districts. The present redistricting divides eight cities, all by the boundaries of the Third Congressional District. Of the seventeen localities comprising part of the Third Congressional District, eleven are divided into two Congressional districts. Of the 562,351 persons in the Third Congressional District, 513,588 are from jurisdictions divided between congressional districts. The unwieldy and distended shape of the Third District confirms the use of race to draw its boundaries.

Plaintiffs' exhibits Px1, and 2A through 2H display more effectively than the written word the distended and unwieldy shape of the Third District.[5] These exhibits display how the boundaries within each of the cities adhere to racial characteristics, and display how most of the precincts split along racial lines. Exhibit Px3 confirms that the Legisla-

ture relied on the classification of voters based upon race at the census block level to divide precincts and apportion large number of voters based on race into, and out of, the Third District. The division of cities on an unprecedented scale cannot be explained on any grounds other than race.[6]

Every one of the fingers which reaches from the whole-county hub of the district, into the divided cities, uses lightly populated territory, barren stretches of river, or other dubious connectors such as highway exits which appear to be leading the wrong way in an effort to reach the black populations which it excises from the various cities.

The bizarre shape and the character of the split cities give credence and confirmation to the racial segregation manifest in this district. Except for the City of Suffolk, every one of the cities split by this district results in the black population of the city being concentrated in that portion placed in the Third District. In Richmond, the Capital of Virginia, 94.78% of a black population of 112,122 is placed in the Third District. *See* Ex. Px5. A similar examination of the precincts shows a preponderance of racial splits, although admittedly race cannot explain the split in every instance. *See* Joint Ex. 50.

While the split of a precinct may appear non-racial, a close examination leads one to the inevitable conclusion that the purpose of the split is to configure the Third District so that a concentration of non-blacks is avoided. *See* Px 3–O to Px 3T.

*Traditional Principles Ignored*

Article II, § 6 of the Constitution of Virginia requires electoral districts to be com-

---

5. See attachment copies of Px1 and Px2A through Px2H which are made a part of this document. [Editor's Note: Maps not reproducible for purposes of publication.]

6. The CAMCAR computer system employed by the General Assembly to assist in redrawing the district lines provided the legislators with information with respect to the various political units, precincts, counties, and cities, as well as the smaller nonpolitical unit of census blocks. (Def.S.J.Ex. at 35.) From the precinct level up, the computer provided not only the population of each political unit, but also its racial composition based on three categories, white, black and oth-

er. CAMCAR also displayed actual election results for each political unit for the years 1983–1989.

No such election statistics are available on CAMCAR for census blocks, but CAMCAR does give the racial makeup of a census block. Thus the computer is more sophisticated with respect to race than to other demographic data other than total numbers. So splitting by blocks is "substantial evidence that it was race that led to the neglect of traditional districting criteria here," just as *Bush,* —— U.S. at ——, 116 S.Ct. at 1953 (plurality opinion) so held in the same context.

posed of contiguous and compact territory. Article I, § 2 of the United States Constitution requires the Legislature to reapportion each electoral district so that there is "equal representation for equal numbers of people;" in short—"one person, one vote." *Wesberry v. Sanders,* 376 U.S. 1, 18, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964). The second condition is compliance with those mandates of the Federal Voting Rights Act, 42 U.S.C. §§ 1971–73. *See Katzenbach v. Morgan,* 384 U.S. 641, 643–47, 86 S.Ct. 1717, 1719–22, 16 L.Ed.2d 828 (1966).

The Court recognizes that in redistricting the Legislature did not ignore political partisanship, protection of incumbent office holders and the desire to keep in separate districts, where legally appropriate, military installations. But the Legislature's general disregard for keeping regions and localities intact, and its abandonment of compactness illustrate that traditional principles were subordinate to the principal reason for the make-up of District 3. Thus, whenever a non-racial adjustment was made, an adjustment elsewhere was made on the basis of race to maintain the district's racial composition. In other words, "[r]ace was the criterion that, in the State's view, could not be compromised; respecting communities of interest and protecting ... incumbents came into play only after the race-based decision had been made." *Shaw,* —— U.S. at ——, 116 S.Ct. at 1901. An example of the plan's disregard for the integrity of traditional localities and regions is its increase in the number of split counties and independent cities. Prior to 1965, no cities or counties were split by Congressional district lines. The Supreme Court, as early as *Wesberry,* 376 U.S. at 1, 84 S.Ct. at 526, and more recently in *Karcher v. Daggett,* 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), has imposed an increasingly strict standard of equality of population among Congressional districts within a State. Even so, between 1964 and 1990 districts apportioned as required resulted in the splitting of no more than five cities and counties. [Pl.Ex. 11] In contrast, as of 1993, the Congressional district plan [CO 830452] splits some 21 independent cities and counties [Pl.Ex. 7, 8], with more than half of those county and

city splits (11) in the Third District. Also, as completed, the entire State's redistricting had only 54 split precincts, but 37 of them were within the Third District. *See* Note 6, *supra.* The inevitable conclusion is that being a black was the predominant factor in being chosen as part of a population making up the Third Congressional District.

When questioning a plan to create what was described as a "minority-majority district," a member of Virginia's Senate and House Committees on Privileges and Elections stated, "A 66% plan does impact all the citizens of Virginia because, to reach that 66% plan, you can gerrymander to your heart's content and thus distort communities of interest throughout Virginia." It is difficult to conclude that voters whose Congressional District encompasses parts of eight cities, seventeen localities (11 of which are divided into 2 Congressional districts), six counties and over 200 road miles of territory harbor a common interest. This conclusion is reinforced by the fact that approximately two-thirds of the population are black Americans and approximately one-third are white or other Americans.

■ If the creation of a safe black district can be said to favor a particular political party, the law does not condemn political partisanship; political gerrymandering is not subject to strict scrutiny. *Bush,* —— U.S. at ——, 116 S.Ct. at 1954 (plurality opinion). (["P]urely political gerrymandering claims" are not justiciable) (quoting *Karcher,* 462 U.S. at 740, 103 S.Ct. at 2663). We find, however, that the Legislature, in its effort to create a safe black district, went further than constitutionally permitted in creating a bizarre shaped district for the predominant purpose of bringing within its boundaries a population in excess of 63% black citizens.

It was inevitable that race would have been a consideration in the mind of the Legislature during the redistricting process. Strict scrutiny results from the fact that a careful review of this record reveals more than a consideration of race.

B. *Strict Scrutiny*

■ Although we find that the Plaintiffs have shown that the Legislature, in adopting

the challenged district, was motivated predominantly by race, this finding does not end the case. *See Miller,* —— U.S. at ——, 115 S.Ct. at 2488. The burden now shifts to the Defendants to demonstrate that its districting plan for District 3 was narrowly tailored to achieve a compelling government interest. *Id.* The Court in *Miller* held that strict scrutiny applies to redistricting plans where "race was the predominant factor motivating the Legislature's decision to place a significant number of voters within or without a particular district." *Id.*

The Court concludes that the evidence proves that the creation of the Third Congressional District was not only presumptively unconstitutional, but that the Defendants have failed to produce evidence of a compelling state interest warranting the utilization of the least restrictive means practically available. *See Bernal v. Fainter,* 467 U.S. 216, 104 S.Ct. 2312, 81 L.Ed.2d 175 (1984).

*Compelling State Interest*

■ Defendants contend that the configuration of the Third District was drawn, in part, to comply with the Voting Rights Act of 1965 ("VRA"). It is this Court's view that this may, under appropriate circumstances, constitute a compelling state interest. *See Clark v. Calhoun County,* 88 F.3d 1393, 1403 (5th Cir.1996). The Supreme Court has held that the "narrow tailoring" requirement of strict scrutiny allows the states a limited degree of leeway in furthering such interests. If the State has a "strong basis in evidence" for concluding that creation of a majority-minority district is reasonably necessary to comply with the requirements of section 2 of the Voting Rights Act and the districting that is based on race "substantially" addresses the § 2 violation, it may satisfy strict scrutiny. *See Bush,* —— U.S. at —— – ——, 116 S.Ct. at 1969–70; *Shaw,* —— U.S. at ——, 116 S.Ct. at 1894.

The Commonwealth contends that it had a compelling state interest in drawing a black majority district: precluding any exposure to a § 2 violation. The Court finds, however, that Defendants' argument that the composition of District 3 was necessary to conform to the Voting Rights Act is simply in error. First, private plaintiffs aside, the Court does

not find the threat of a § 2 lawsuit by the United States to be very credible. The record reflects no indication that the Department of Justice advocated a "maximization" policy for Congressional districts in Virginia. Indeed, the acting head of the Voting Rights section for the Department of Justice spoke in Richmond prior to the redistricting process and stated that the Department did *not* read the VRA to require that if a majority black district could be created, it must be created.

■ Defendant–Intervenors assert that in the context of local elections, § 2 claims have been successfully prosecuted or settled in a number of localities in Virginia. They contend that this litany of litigation somehow establishes a broader § 2 harm that the Assembly chose to address when it drew District 3. Only 5 of the 13 contested localities are partially, and none are wholly, in the Third district. Thus, District 3 does not directly address the harm asserted. As the Supreme Court stated in *Shaw:* "The vote dilution injuries suffered by these persons are not remedied by creating a safe majority-black district somewhere else in the State." *Shaw,* —— U.S. at ——, 116 S.Ct. at 1906. If a real § 2 liability exists, then the State must cure it in the affected areas.

Not only is the Court unconvinced that the district was necessary to avoid § 2 liability, the Court finds that the district does not meet the three *Gingles* preconditions necessary for such a district. *Thornburg v. Gingles,* 478 U.S. 30, 50–51, 106 S.Ct. 2752, 2766–67, 92 L.Ed.2d 25 (1986). In *Gingles,* the Court held that to prove a case of vote dilution, the minority group must show three factors: 1) the group resides in a geographically compact area; 2) it is politically cohesive; and 3) that the white majority votes sufficiently as a bloc to defeat the minority's preferred candidate. *Id.* The Court finds that Defendants have failed to prove the third *Gingles* prong, and proof of the first is doubtful at best.

As discussed previously, the district does not draw upon a geographically compact group of black voters. That is shown by our discussion of the bizarre lines of the district

which are designed to draw in black voters while keeping white voters out. *See* Ex. Px 22. Whether there might exist a compact enough group of enough black voters to satisfy the *Gingles* requirement is a question we need not decide, however, for we find, that the third *Gingles* requirement of white majority bloc voting is not met. Defendants argue that voting in and around the Third District is racially polarized such that white voters are usually able to prevent black voters from electing candidates of choice. An examination of election results proves this conclusion false. The most persuasive expert opinions in this record make clear that white bloc voting does not prevent blacks from electing their candidates of choice. *See* Weber Report, PEx.22 at 102–104. Moreover, Governor Wilder's 1989 victory and then-Senator Scott's continued election victories demonstrate that black candidates could and were elected despite the absence of a black majority district.[7]

The Virginia Legislature used the racial data at the census block level to classify voters by race and assign them based upon race to a district. There is simply no evidence that the Legislature took any steps to narrowly tailor the Third Congressional District, nor has it produced enough evidence of a compelling government interest. The bizarre and tortured shape of the district contradicts Defendants' assertion that the district is narrowly tailored. The Supreme Court has held that non-compact districts foreclose the VRA as a compelling state justification.

> We have, however, already found that all three districts are bizarrely shaped and far from compact, and that those characteristics are predominantly attributable to gerrymandering that was racially motivat-

ed... These characteristics defeat any claim that the districts are narrowly tailored to serve the state's interest in avoiding liability under § 2 because § 2 does not require a State to create, on predominantly racial lines, a district that is not "reasonably compact."

*Bush,* —— U.S. at ——, 116 S.Ct. at 1961 (plurality opinion).

A mere majority of blacks apparently was not enough to satisfy the Legislature's perceived goal of avoiding § 2 liability. While the Court finds that the Legislature not only lacked a compelling state interest for its impermissible use of race, it also did not seek to accomplish its goal by narrowly-tailored methods.[8]

## CONCLUSION

The Third Congressional District is racially gerrymandered in violation of the Equal Protection Clause of the Fourteenth Amendment because it relies upon the classification of large numbers of Virginians by race so as to include or exclude them from that district. The Court finds that the Commonwealth of Virginia subordinated traditional districting principles, such as compactness, communities of interest, and respect for cities and counties, to accomplish its goal of a safe black district. Because race predominated in the drawing of the district, the Court applied strict scrutiny to see if the use of race was necessary to accomplish a compelling state interest. The Commonwealth has failed to prove that District 3 satisfies a compelling state interest or that it is narrowly tailored. Accordingly, this Court will strike down this district as violative of the Fourteenth Amendment to the Constitution of the United States.

An appropriate Order shall issue.

---

7. The Court notes that of the current members of the Virginia House of Delegates, 91 are Caucasian and 9 are black.

8. The ordinary rule is that we will not decide a constitutional question "unless absolutely necessary to a decision of the case." *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Justice Brandeis, concurring). In *Richmond v. J.A. Croson Co.,* 488 U.S. 469, 505, 109 S.Ct. 706, 727–28, 102 L.Ed.2d 854 (1989) (plurality opinion), however, the Court held that a program of preferences for minority owned business failed to pass strict scrutiny because no compelling state interest had been demonstrated. The Court then proceeded to further hold that the program was not narrowly tailored. *Id.* at 508, 109 S.Ct. at 729–30. Thus the decision affirmed the Fourth Circuit's similar holding that the program failed an examination under strict scrutiny. *J.A. Croson v. Richmond,* 822·F.2d 1355, 1360 (4th Cir. 1987).

## ORDER

For the reasons stated in the Court's Memorandum in this cause, it is ADJUDGED, ORDERED AND DECREED as follows: The Plaintiffs' prayer that Title 42 U.S.C. § 1973 be declared as having no further force and effect, insofar as it requires the Commonwealth of Virginia to seek preclearance of its state-wide redistricting plan, be and the same is hereby DENIED for failure to prosecute.

It is ADJUDGED AND DECLARED that that portion of Virginia Code Section 24.2–302 dealing with the Third Congressional District of Virginia be and the same is of no further force and effect insofar as it purports to establish the geographic boundaries of a Third Congressional District for the Commonwealth of Virginia on the grounds that same is violative of the equal protection clause of the Fourteenth Amendment to the Constitution of the United States.

IT IS FURTHER ADJUDGED, ORDERED AND DECREED that the Defendants, its agents, servants, employees and all persons acting in concert therewith are enjoined from coordinating and/or conducting an election of any person to membership in the United States House of Representatives from the Third Congressional District until such time as the Virginia General Assembly enacts, and the Governor approves, a new redistricting plan for said district which conforms to all requirements of law, including the Constitution of the United States.

Plaintiffs are entitled to reasonable counsel fees and all taxable costs.